Christian, J.
delivered the opinion of the court.
This is an appeal from the Circuit court of Wythe county. The hill is filed by Georgiana F. Bailey against her husband, James A. Bailey, seeking a divorce. The court below decreed a divorce a mensa et thoro, and from this decree an appeal has been allowed to this court.
Happily for the interests of society, and the sanctity of marital rights and relations, suits of this character are not of frequent occurrence in this State. And in these modern days of so-called social progress and social reform, it is a fact worthy of record, and. one which fitly illustrates the purity of social life, and the inviolable sanctity of the marriage bond in this State, that there can be found but two reported cases, in all its judicial history from the foundation of the Commonwealth down to the present time, touching questions arising out of the separation of husband and wife. And the two cases referred to were not suits for divorce, but for alimony, brought by the wife after desertion by the husband.
These facts speak volumes in favor of the morality, purity and chastity of that social life, which recognizes marriage as the very basis of the whole fabric of civilized society, and seeks to preserve its sanctity inviolable. We regret that this first case must be put upon the record of reported' cases in Virginia.
The plaintiff’s bill charges the defendant with adultery, cruelty, and abandonment, or desertion, and prays “to be divorced from her said husband so far as facts upon final hearing may justify,” and asks the coui’t for a decree for so much of his estate “as may be necessary to .support her and her child so long as she and the said James A. Bailey may both live.” The charge of adultery is not proved; nor is there evidénce sufficient to *47 .support the charge of cruelty. Indeed, both charges are •abandoned by the learned counsel for the appellee (Mrs. Bailey) in his argument of the case here; and the whole' •case rests upon the charge of abandonment or desertion.
According to the provisions of the Code,- ch. 109, § 7, “ a divorce from bed and board may be decreed for cruelty, reasonable apprehension of bodily hurt and aban•donmeut or desertion.” Before considering the facts of the case, it becomes necessary to enquire, what in its legal sense, is that desertion, for which a court may decree a divorce a. mensa et thoro ? Upon this question, we have no express adjudication in this State. But desertion is well defined by the decisions of the English ecclesiastical ■courts and of the courts of the other States in the Union.
Desertion is a breach of matrimonial duty, and is ■composed first, of the actual breaking off of the matrimonial cohabitation, and secondly, an intent to desert in the mind of the offender. Both must combine to make the desertion complete. Bishop on Marriage and Divorce, § 506. The intent to desert is usually the principle thing to be considered. Obviously, a mere separation by mutual consent, is ’ not desertion in either, nor as a matter of proof can desertion be inferred against either from the mere unaided fact that they do not live together, though protracted absence, with other circumstances, may establish the original intent. Gray v. Gray, 15 Alab. R. 779; 1 Harris’ Pa. R. 211; Bishop on Marriage and Divorce, § 511; 9 B. Mon. R. 295, 303; 3 Metc. R. 257. But it is equally obvious, and it follows from well settled principles of law, that when a separation and intent to desert are once shown; the same intent will be presumed to continue until the contrary appears. 1 Greenl. Ev. § 41, 42; Gray v. Gray, 15 Alab. 779. Under our statute, no particular period is prescribed in which the desertion shall continue to entitle a party to a divorce a mensa et thoro. By the § 6, of ch. 109, Code, *48 it is provided that a divorce from the bond of matrimony, among other causes, may he decreed where either party -willfully deserts or abandons the other for five years, in favor of the party so abandoned. We take it as the fair and reasonable construction of the 7th section, which authorizes a decree for divorce from bed and board for desertion, that desertion for less than five years may be good cause for a divorce from bed and board, and that the discretion of the court is not to be limited by any fixed period, but that discretion is to be soundly exercised according to the facts and circumstances-of each particular case, and 'the settled principles-of. law which govern the established facts in such case. The courts have not laid down any particular rules of evidence for determining whether a separation does or does not, as matter of proof, amount to desertion ; the question does not admit of such rules, but each case must rest on its own circumstances. Still, the-intent to desert is a fact of which the court must.in some way be affirmatively satisfied. Bishop on Mar. & Div. § 520; Friend v. Friend, Wright’s R. 639; Brainard v. Brainard, Wright’s R. 354. In Gregory v. Pierce, 4 Metc. R. 478, Shaw, C. J., said : “ The husband’s desertion may be proved by a great variety of circumstances, leading with more or less probability to that conclusion; as, for instance, leaving his wife with a declared intention never to return; absence for a longtime, not being necessarily detained by his occupation or business or otherwise ; making no provision for his-wife, being of ability to do so : prohibiting, her from following him, and many other circumstances.” 4 Metc. R. 478, cited in Bishop on Mar. & Div. 520.
We think it may be safely asserted,, as a general principle of Jaw to be extracted from the English and American cases on the subject, that, wherever there is an actual breaking offi of matrimonial- cohabitation, combined with the intent to desert in the mind of. the offen *49 der, in such case desertion is established, and the party deserted is entitled to a divorce a mensa et thoro ; and, if it be the wife, she is entitled to alimony.
Having thus laid down the legal principles which apply to suits for divorce, upon the ground of abandonment or desertion, we come now to apply these well-settled principles to the evidence in the case before us. But, upon the threshold of this enquiry, we are met with a question which must first be disposed of. The' evidence contained in the record, is in the main made up of letters, of both the plaintiff and defendant, filed and relied upon by the plaintiff It is insisted by the learned counsel for the defendant, that these letters are but the declarations and admissions of the parties, and cannot, by-the express terms of the statute, be regarded as evidence' in the cause. They, rely upon that provision of the statute which declares that “such suit shall be instituted- and conducted as other suits in equity, except that the bill-shall not be taken for confessed; and whether the defendant answer or not, the cause shall be heard independently of the admissions of either party in the pleadings or otherwise,” Code, ch. 109, § 9. Let us briefly examine this objection. Previous to the act of 1847-48,' from which this provision of the Code is taken, the jurisdiction of suits for divorce was vested in the legisla-' tui-e. When that jurisdiction was by that act transferred to the courts, the legislature imposed by statute certain limitations and restrictions to the exercise of that jurisdiction. They defined in express terms the grounds-upon which alone the courts were authorized to decree a divorce a vinculo -matrimonii, as well as those upon which the courts might decree a divorce a mensa et thoro. The whole scope and purpose of the act was to limit the jurisdiction of the courts, and to discourage suits of this character. Having specified partic'ulai’ly the causes for which the courts might sever the ties which bind together' husband and wife, their purpose was to prevent a divorce *50 from being obtained by the collusion of the parties. All that was iutended by the 9th section (above quoted) was to put in the form of a statutory enactment, that principle which had been well settled by the ecclesiastical courts of England and the whole current of decisions of the courts of the States of the Union, (where courts and not the legislature had jurisdiction of the subject bf divorce), to wit, that a divorce would never be granted merely upon the consent, or on the default of the party charged, but only on proof of the cause alleged. 1 Matthews’ Digest, 590; Williams v. Williams, 3 Greanl. R. 135; Holland v. Holland, 2 Mass. R. 154; Baxter v. Baxter, 1 Mass. R. 346. This salutary rule was intended to prevent parties who were weary of the bond of matrimony, and impatient of its restraints and obligations, from obtaining the aid of the court through their own collusion. and default. It was a rule for the protection of public morals and the sanctity of the marriage relations. These were the paramount objects of the rule, and these were the paramount objects of the statute, enforcing a well settled rule of law. But surely it could never have been the intention of the legislature to change the rules of evidence, when the suit was a suit for divorce, and provide a different mode of proving facts in such a case. If the construction contended for by the learned counsel for the appellant be the true one, then everything that the parties write, everything that the parties say, no matter under what circumstances, must not be read or heard by the court, because they are the admissions of the parties, and under the operation of the words of the section “ or otherwise must be excluded. So that, according to this construction, in a suit for divorce upon the charge of' adultery, the letters of the guilty party to his or her paramour, written at a time when the other party was living in the unsuspecting confidence and happy security of conjugal fidelity and affection, could not be read in evidence in behalf of the injured party. Or if the ground *51 alleged be desertion /letters from the husband ordering the wife from home under threats of violence, plainly expressing his purpose not to provide for her support, and deliberately declaring bis intention to desert her forever, according to the theory of the counsel, such a letter could not be read in evidence in behalf of the wife ; and in the one case, though the guilt of the party is acknowledged and unquestioned, the court cannot lend its aid to sever a connection which by the laws of God and man it is a crime to continue; and in the other, the helpless and deserted wife is to be turned out upon the cold charities of the world without the right or the power to have appropriated to her support one dollar of her husband’s estate, though it all might have been derived from her. These would be the unjust and absurd results to which such a construction of the statute would inevitably lead. We cannot give it such a construction, but we think that this section was merely intended to prevent decrees for divorce upon the collusion of the parties, or upon the consent or default of the party charged. We are of opinion that the letters of the parties may be admitted in evidence in a suit for divorce (except where it is shown they were written by collusion for the purpose of obtaining a divorce,) just as in any other case, for the purpose of proving, or as tending to prove facts pertinent to the question which the court is called upon to decide, to have precisely the same weight as in other cases. The question which the court was called upon to decide in this case was whether James A. Bailey had abandoned and deserted his wife. One of the constituent elements of the offence of desertion, being the intent to desert, in the mind of the offender, we think the letters of the parties may be r ead as evidence of that intent. Their genuineness are not impeached nor attempted to be impeached by the evidence in the cause.
The attempt upon the part of the able and ingenious counsel to srfow in argument, that these letters were fab *52 ricated for the purpose of using them afterwards in a-, suit for a divorce which she contemplated at the time--they were written, was entirely futile. No impartial, and disinterested man can read those letters without the conviction that they were the spontaneous and natural outgushings of a heart stricken with grief for the loss of her husband’s affections, and yearning for the restoration of conjugal love and confidence which had made her-happy in the early days of her wedded life.
. Take for example the following extracts from two only, (and there are numerous others of the same character) of her letters : “You -say that your feelings are entirely alienated from me, and that you have no love for me, and never will have again. Pause here my dear-husband, and reflect on your own words, cruel words,, that you have written to your young and confiding wife, whose very existence is bound up in you ; and take, oh take them back, I beseech you. Please answer this letter without delay and téll me you were only joking concerning the separation, or something to alleviate my sufferings, for no one on earth can be more miserable than I am with that letter staring me in the face, and with, the knowledge that I love so deeply and purely and am not beloved in return.”
Take another: “When Oscar came, I met him and asked him for an answer to my letter’. He said he gave you mine,’and that you threw it into the fire and cursed' me, and said you wanted to hear nothing from me, and. wanted me to leave your house ; for you never intended coming home until I did leave. Just think how miserable I felt. Scarce a twelve month has elapsed before I have the consciousness of having lost my husband’s affection; - May you never know blasted hope. It withers all our enjoyment• it sears the best qualities of the heart. Hays gone by of love and happiness, my soul can never-forget. Be. not too hasty in separating from me, and do not debar me from a share of your affections and your. *53 ■society forever. A woman’s love once won, remains ¡steadfast and faithful forever. Time and change cannot alter it. It burns purely and brightly amid care and •sorrow, coldness and neglect, and it asks nothing but a return of love. If your trust in me be so poorly based that it can be thrown away by a breath of detraction ; if you be so ready to beliéve any falsehoods you may have been told on me, you have never loved me with that pure and sincere affection that I have bestowed on you, my heart’s idol. ”
Can any man read such letters as these, and say they were coldly and deliberately fabricated after a purpose formed to bring a suit for divorce, to be read in evidence in the cause ? Can we believe this of one against whom the record does not show a breath of suspicion affecting her fair fame as a wife or woman ? Ai’e we, without evidence and against evidence, to believe that •she has, with deliberate malice and falsehood, palmed off on the court below a wholesale forgery and fabrication, and thus make her, whose fair fame and name has not been assailed in the record, the basest of her sex—a fiend incarnate % The letters themselves bear upon their face internal evidence that they are genuine, not only from the intrinsic nature of the letters, but the fact that many of them refer to her husband’s letters, and to time, place and circumstances, which show beyond question that they are really what they purport to be; and the court below was right in regarding them as evidence to be considered in the trial of the cause.
Having disposed of this question, we come now to state what are the facts as proved upon the whole record, and apply to those facts the principles of law hereinbefore set forth.
The parties were married on the 22d day of July 1865. A few weeks after the marriage, the defendant, James A. Bailey, went to the city of Richmond, where he remained about a month. He then returned home, and *54 remained until the 7th day of November 1865, when he left for Memphis; from thence he went to St. .Louis, and afterwards to New York, and did not return home again until November 1866. He then remained at home about two weeks, left again for New York, aud did not return until the latter part of October or the first of November 1867. He was many years the senior of his wife, being a widower with ten children when he married her; but the record shows that, up to the return of Bailey in November 1866, nothing had occurred of an unpleasant nature between them, and there is no proof that she even unreasonably complained of his long absence. On his return in November 1866, there seems, for the first time, to have grownup certain coldness between them. What was its. cause the record does not show. But it is shown that he remained only about two weeks, and left again for New York, without taking leave of his wife, though she was at dinner with him, aud he left immediately after dinner, leaving her in the dining room when he left to start on his journey. After he left, she wrote numerous letters to him, all (except the first, in which she reproaches him, but not harshly, for his coldness after their long separation) breathing the most devoted affecr tion for him, begging his forgiveness if she had offended him, and praying him to return to his home. All these affectionate appeals he treats with silent contempt for months.
The first letter which he deigns to write to her, is in January ’67. In this letter he coldly and cruelly says : “You wish to know whether I wish you to go up home and stay. As to that, you can use your own discretion. If you choose to go there and stay you can do so, and I will support you and your child; but as for ever living together as husband and wife, that is played out.” On the 3d of May he writes the following: “Miss Georgie: I have learned that you are running me in debt in Ab *55 ingdon, and trying every way to ruin me and my family. Now, I want you to understand, that if I hear of another bill you have made, I shall be under the necessity of ad-vertising you in the Virginian ; disagreeable as it may be to me, I am bound to do- it for the protection of myself and family.” The -last letter received from him before filing her bill in September 1867, bears date Juné 16th 1867. It is couched in terms so cruel and harsh as would be reprehensible if used towards any woman, much' more to a wife, in which he complains of bills she had made with merchants at Abingdon, and deliberately charges her with falsehood and fraud. Notwithstanding such letters as these, she continues to write to him in the most affectionate and endearing terms, imploring his for-; giveness, praying for reconciliation, appealing to him in the name of their early wedded love, and in the name of their Infant child, the holy pledge and mutual bond of their union. But all in vain. He refuses to be reconciled, but deliberately informs her that he no longer loves her, and that they can never live together as husband and wife.
Here then is a man who marries a young wife, takes her to his home, leaves her there, as she says in one of her letters, to take his first wife’s place in the very face of his grown children, without him to aid and advise her in her embarrassing duties; and he goes off to ply his nefarious trade as a professional gambler, in the cities of St. Louis, Memphis, and New York. He visits her but once in two years, and remains hut two weeks, and then leaves her without a kind good-bye, and returns not until after her bill for divorce has been filed. She then again seeks reconciliation. He spurns her humble petition for pardon, and refuses even to visit his ill child lest he may come in contact with his rejected wife. "We are constrained to say that this conduct amounts to desertion. Here is a case of actual breaking off matrimonial cohabitation, combined with the intent *56 to desert deliberately declared, not only in words, but in acts, which brings the case within the very definition of 'the authorities.
"We are constrained to say, too, that the evidence does not show any default upon the part of the wife that can justify, palliate or excuse the misconduct of the husband in this case. The only complaint that able and ingenious counsel can find to allege against her is, that she made an account with the merchants of Abingdon amounting to $300, and that she spent most of her time at the house of her mother during his long absence. An inspection of the accounts filed show that they were necessary for the support and maintenance of a woman and her child, and it is proved that a part of them were purchased for the use of other members of his family. As to her frequent visits to her mother who lived in the same neighborhood, what so natural, as that when left for twelve months at a time by her husband she should seek her mother’s society, especially in those trying days of her first maternity, when nothing, not even the presence of the husband, can take the place of a mother’s care and a mother’s sympathy. Not being in default, then, she is entitled to a divorce from the bed and board of a man who has so utterly disregarded the marital rights of the wife and the marital obligations of the husband as to reject and desert her to whom he had solemnly pledged bis vows to love, cherish and protect.
' The only remaining question to be considered is as to the amount to be allotted to the wife for alimony. The-court below fixed the sum of thirty dollars per month as a fair allotment of alimony in this case. The counsel for the appellant insist that this is excessive. We do not think so. His property is estimated by the commissioner, to whom the matter was referred, as follows : his real estate at $7,513 ; his personal at $1,020, and his interest in a mercantile business at $1,000 ; making the aggregate sum of $9,533. But it is said his debts will take *57 half of Ms estate. A judgment is exhibited in favor of Hopkins, Hull & Atkinson for the principal sum of $3,026 78, (with considerable interest), against the appellant as surviving partners of Huntze & Co. Butso far as shown to the court, it may be that the partnership assets will be sufficient to pay this debt. The commissioner estimates his interest in that concern as worth $1,000, and the fair presumption is that this estimate is based upon the hypothesis that the partnership assets would pay the partnership debts. A deed of trust is also exhibited, which secures a debt to Milton White of $3,998 ; but this deed upon its face provides that the trustee shall sell the land if it be not paid on the 1st day of June 1868. Bor aught that is shown to the court, that debt, or the greater part of it, has been paid; as three years have •elapsed and the land remains unsold.
In regard to allotment for alimony, there is no fixed rule. It is a matter within the discretion of the court. Yet, it is not an arbitrary but a judicial discretion, to be exercised in reference to established principles of law relating to the subject, and upon an equitable view Of all the circumstances of the particular case. Bishop on Marriage and Divorce, § 603; Rees v. Rees, 3 Philim. R. 387, 1 Eng. Ec. R. 418; Burr v. Burr, 7 Hill N. Y. R. 207. The general rule in respect to alimony is, that the wife is entitled to a support corresponding to her condition in life and the fortune of her husband. And in the language of Nelson C. J., in Burr v. Burr (supra) : “ When the delinquency of the husband has been established, and the wife is the injured party driven by his cruelty or other wrongful conduct, from the comfort of domestic enjoyments, she should be liberally supported.”
But while alimony is commonly defined a proportion of the husband’s estate,” yet the duty of a husband to maintain his wife does not depend alone upon his having visible tangible property. While the parties are living together, they are bound to contribute by their several *58 personal exertions to a common fund, which in law is the husband’s, but from which the wife may claim support. If she is compelled to seek a divorce on account of his misconduct, she loses none of her rights in this respect, only she is to draw her maintenance in a different way; that is under a decree for alimony, based, if he has no property, upon his earnings or ability to earn money. Bishop on Marriage and Divorce, 604; Cooke v. Cooke, 2. Philim. R. 40, 1 Eng. Ec. R. 178; Kirby v. Kirby, 1 Paige’s R. 261; 2 B. Mon. R. 370.
It appears in this case, that the appellant was able, from the income dei’ived from his property and his personal earnings, to support in comfort a large family at home, and to maintain himself and two grown children for a considerable time in the city of jSTew -York. These earnings, whether derived from his nefarious trade as a faro-dealer, or from legitimate business, may be considered in providing a support and maintenance for his wife and infant child. To lessen the amount decreed by the court below, would be to give to the wife a mere pittance,, and would violate not only her rights, but the wise and humane policy of the law. The high morality of the law requires, that no man shall be permitted to take a woman as his wife, and after making her a mother*, throw her upon society, in the undefined character of a wife without a husband, burdened with disgrace, tO' struggle with poverty.
In fixing the amount of alimony in a case like this, the court will not seek to find how light the burden may possibly be made, but what, under all the circumstances, will be a fair and just allotment. We are not disposed to disturb the decree of the court below in this respect. If it be a grievous burden upon the appellant, he can easily relieve himself of that burden, by receiving back to his “ bed and board ” the wife whom he has driven from him by his own misconduct, and who has-shown by the record that she is willing and anxious to return to him.
*59 We regret that this first case must be put on .the record of reported cases in Virginia, and in conclusion we express the hope that such cases may be in the future as infrequent as they have been in tbe past; that, amid the whelming tide of social and political revolutions which threaten to sweep away all the forms of our cherished southern civilization, one pillar at least of the social fabric may still stand firm, and that the time may never come when the sacred bond of matrimony can be lightly broken, or the holy duties and high obligations it imposes, can be disregarded with impunity; but that marriage may in the future, as it has been in the past, be ever recognized in Virginia as an institution to be cherished by law and sanctified by religion, as one upon which alone the happiness and purity of social and domestic life must ever depend.
We are of opinion that the decree of the-Circuit court of Wythe county be affirmed.
Decree aeeirmed.